**Fran J. LYNCH, Plaintiff,**

v.

**NEW DEAL DELIVERY SERVICE INC., Steven Sacharoff and Bernard Geik, individually and in their capacities as principals of New Deal Delivery Service Inc., Defendants.**

**Civil No. 95–6269 (WHW).**

United States District Court,
D. New Jersey.

Aug. 12, 1997.

Jane B. Jacobs, Klein, Zelman, Rothermel & Dichter, L.L.P., New York City, for Plaintiff.

Pamela A. Phillips, Fischbein, Badillo, Wagner, Harding, Jersey City, NJ, for Defendants.

## OPINION

WALLS, District Judge.

Plaintiff Fran J. Lynch brings this suit against defendants New Deal Delivery Service, Inc., Steven Sacharoff and Bernard Geik, alleging that they discriminated against her and terminated her employment on the basis of her sex, created a hostile work environment, subjected her to *quid pro quo* sexual harassment, and fired her in retaliation for resisting the alleged sexual harassment and hostile environment. She also charges defendants with intentional infliction of emotional distress, violation of the public policy of the State of New Jersey, breach of contract, and breach of the implied covenant of good faith and fair dealing.

Defendants now move for summary judgment on all counts of the Complaint. Pursuant to Rule 78 of the Federal Rules of Civil Procedure, the Court decides this matter on the basis of the written submissions of the parties. For the reasons stated below, the motion is granted in part and denied in part.

## I. FACTUAL BACKGROUND

Plaintiff Fran J. Lynch ("Lynch") was employed by defendant New Deal Delivery Service, Inc. ("New Deal") as its chief financial officer from November 8, 1993 until she was fired on July 18, 1994. Defendants Steven Sacharoff ("Steven Sacharoff") and Bernard Geik ("Geik") respectively serve as chief operating officer and president, and are also part owners of New Deal. For most of Lynch's time at New Deal, and until his death in May 1994, the organization was run by Bernard Sacharoff ("Bernard Sacharoff"), the principal owner of New Deal and the father of Steven Sacharoff.

Defendants assert that at the time that Lynch was hired, New Deal was in a precarious financial position. It was hoped that Lynch, with her experience and financial expertise, would "turn the company around." Certification of Steven Sacharoff ("Sacharoff Certif.") at ¶ 4. When she was hired, Lynch sent a letter to Steven Sacharoff outlining the terms of the employment agreement they had reached over the telephone. The relevant portions of the letter, dated November 1, 1993, read as follows:

> This letter will serve the purpose of outlining the terms of my employment with New Deal Delivery Service, Inc. It is not to be construed as a contract of employment, obligating either the employer, New Deal Delivery Service, Inc. or the employee, Fran J. Lynch, to a specified contract period.... Commencing November 8, 1993, the following compensation agreement will be in effect:
>
> a) A base annual salary of $135,000
>
> b) A bonus incentive plan payable at the end of 12 months of employment, or upon an earlier termination of our relationship as follows:
>
>> Employee will utilize a "best efforts" approach to reduce both fixed and variable expenses of New Deal Delivery Service, Inc. Employee will quantify savings to Employer in an agreed upon fashion. The first $750,000 of savings will flow to Employer, with an incentive to be paid to Employee of 10% of all savings in excess of the initial $750,000. This incentive bonus shall be payable at the end of the twelve months of employment or upon an earlier termination of our relationship, and shall be subject to the respective employment taxes in effect at the time.
>
> \* \* \* \* \* \*
>
> This document represents the complete agreement between the parties, and there are no written or oral understandings, promises or agreements that are not incorporated herein in full.

Sacharoff Certif., Exh. B. The letter is signed by Lynch and Steven Sacharoff, on behalf of New Deal, and there was no other writing between the parties. Defendants and Lynch agree that Lynch was hired as an "at-will" employee.

On December 15, 1993, Lynch's birthday, Stephen Pirrone ("Pirrone"), New Deal's executive vice president, told Lynch that there was a vendor in the office who needed to see her.[1] Lynch asked if she could set an appointment with the vendor for a later date, but Pirrone insisted that she come with him. Lynch walked with Pirrone into an area where a male stripper began to perform. She later testified that there were sixty to seventy employees in the room; however, Pirrone recalls only about fifteen people present. Lynch protested when the stripper lifted her into the air and she requested that he put her down, after which she returned to her office. Pirrone came to see Lynch after the performance and she told him that she thought what had happened was inappropriate. Pirrone apologized, but also explained, "You have to learn to lighten up a bit. We are all family here. Women need this to blow off steam. We do it all the time." Deposition Testimony of Fran J. Lynch ("Lynch Dep.") at 184:21–24, 185:5. Lynch saw Steven Sacharoff later in the day and when she asked if he knew what had happened, he smiled in response. Pirrone testified that female employees in the office sought his permission to bring in the stripper and asked him to pay for the performance, which he did out of his own pocket. He did

1. Pirrone is not a defendant.

not arrange for the stripper. Lynch never discussed the incident with anyone else until she filed this lawsuit.

During Lynch's time at New Deal, defendant Geik called her at her apartment several times at night. He would begin the conversations by asking Lynch, "Hi, babe, what are you doing?" *Id.* at 210:12–13. Geik would then ask her a business question that she had already answered during the day and would always end the conversation by asking Lynch not to tell anyone that he had called her. Lynch admits that Geik never proposed anything improper, and she never let him know that she found the phone calls to her home offensive.

In late April or early May 1994, Geik told Lynch, "You look really great. I can't help noticing since you have been working out, you must have lost a lot of weight. It's not that I stare at your body all the time, but you can't help noticing." *Id.* at 213:19–23. On several other occasions, Geik suggested that he and Lynch work out together at his gym and that they have dinner afterwards. Lynch declined the invitations, and states that Geik did not appear hostile or try to force or pressure her to change her mind.

During a meeting with Steven Sacharoff and Pirrone, Geik asked Lynch for the key to the apartment that New Deal was renting for her. Lynch refused to give it to him. Geik then asked her, "What do you do on week nights? You got something on the side? Are you playing around?" *Id.* at 215:15–18. He had made similar comments on other occasions in the presence of Lynch's co-workers. In the spring of 1994, Geik discussed his marital problems with Lynch during a car ride to a meeting. He explained to Lynch that he was trying to decide whether or not he should stay married. Lynch never complained to anyone regarding Geik's conduct.

While Lynch was employed at New Deal, several incidents occurred involving other female employees. One involved a receptionist named Annie who Pirrone told Lynch to fire. When Lynch asked why, Pirrone replied, "Sachs [defendant Steven Sacharoff] is on the loose again. He found a new toy. We are going to have a problem. She is too pretty." *Id.* at 193:10–12. Pirrone said that Steven Sacharoff had a habit of "hanging around the attractive girls" and "putting his hands on them." *Id.* at 194:13–18. Lynch observed Steven Sacharoff hanging around Annie and once saw him sitting next to her with his hand on her knee. According to Lynch, Annie was replaced with another "pretty" receptionist with whom Steven Sacharoff also spent a lot of time. *Id.* at 198:19–25.

Another episode involved Linda Lefebre ("Lefebre"), who was a collections manager at New Deal. Lefebre approached Lynch and asked her to "do something" about Steven Sacharoff because he was "hanging around [her] desk" and "putting his hands on [her]." *Id.* at 200:18–201:2. When Lynch related this incident to Pirrone, he explained that this type of behavior had occurred before and that Bernard Sacharoff, Steven's father, knew of his son's problem. Pirrone told her that Steven Sacharoff had also bothered a secretary named Heather to the point where she intended to quit.

During the second quarter of 1994, Lynch was asked to comfort Lori Gancarz ("Gancarz"), one of the secretaries at New Deal. Gancarz was upset after Steven Sacharoff lifted her into the air, causing her dress to go over her head. After Pirrone and Gancarz spoke to Bernard Sacharoff about this incident, Bernard Sacharoff warned his son in front of Pirrone that if this ever occurred again, he would be thrown out of the business. Lynch never spoke to anyone at New Deal regarding these events.

The final occurrence before Lynch's termination involved Scott Roberts ("Roberts"), personnel director for Unimark and S & R, two affiliated companies with which New Deal shares common ownership. Roberts had apparently been arrested at Unimark for exposing himself to a female job applicant. Lynch learned of the incident during a meeting when Steven Sacharoff, Geik, and another man were laughing and joking about it. Concerned by their cavalier attitude, she advised them to "sober up," call counsel to determine a corporate response, and find out whether they had employment practices liability insurance. *Id.* at 224:2–15.

Pirrone terminated Lynch's employment on July 18, 1994. Lynch twice asked for an opportunity to speak to Steven Sacharoff regarding her performance bonus, but was never given that opportunity. Defendants claim that they informed Lynch that she was let go because of financial difficulties. Lynch asserts that she was never offered any explanation for her dismissal (*id.* at 281:10–18), but then testified that she was informed that it was a lay-off (*id.* at 288:13). Lynch avers that she never received any criticism of her work, nor was she ever warned that her job was in jeopardy. After Bernard Sacharoff died, approximately six weeks before Lynch's discharge, Geik told her, "You know, we are relying on you, Fran, you're in charge now, Bernie would have wanted you to carry on[.] ... We are depending on you[.] ... The company is solid. Please stay with us." *Id.* at 273:9:15. Lynch believes that a disagreement she had with Steven Sacharoff about a health insurance renewal was a contributing factor to her termination.

Steven Sacharoff contends that he had told Lynch of his concerns regarding New Deal's accounts receivable. He admits, however, that he never expressed any dissatisfaction with her performance in writing nor did he warn her that her job was in danger. Defendants replaced Lynch with a man whom they paid $50,000 less than they had paid her. Approximately six weeks before Lynch's discharge, Pirrone received a $20,000 raise in salary.

According to Lynch, during her tenure at New Deal she saved the company $407,487.50 on its insurance premiums, $364,573.37 on a workers compensation audit, $59,417 on a cargo renewal, $78,926.40 on a health insurance renewal, and $95,251.55 in miscellaneous savings. Lynch claims that Steven Sacharoff told her after she had saved the organization $407,487.50 on an insurance renewal, "[T]hat's one for your column." Certification of Fran J. Lynch at ¶ 8. She understood his remark to refer to the bonus discussed in the letter outlining the terms of her employment. However, defendants contend that the parties never established a method for quantifying savings for the proposed bonus, and Lynch herself acknowledges that there was "something more" to be agreed upon regarding the savings to which the letter referred. Lynch Dep. at 135:8–11.

In October 1994, after Lynch was fired, Gancarz complained once more about Steven Sacharoff's behavior. Pirrone and Geik agreed to negotiate a settlement with her. Accordingly, Gancarz and her husband, who also worked for New Deal, received $50,000 plus medical benefits for a year to leave the company. Gancarz was making $30,000 a year at the time and her husband was earning between $30,000 and $35,000 a year. Also in October 1994, Geik settled with another employee named Karen McElroy ("McElroy") who had complained about inappropriate remarks made by Steven Sacharoff. McElroy received $30,000 in-exchange for her resignation. She had been earning $325 per week, or approximately $17,000 per year. Finally, a female employee named Marianne Guthrie also complained in October about Steven Sacharoff's offensive comments. She did not seek a financial settlement, but wanted his conduct stopped. The record contains three letters from Geik to counsel for New Deal regarding these claims. The letters state that Gancarz, McElroy and Guthrie had accused Steven Sacharoff of sexual misconduct and sexual harassment.

On October 14, 1994, Pirrone wrote to advise counsel of the Lori Gancarz incident. According to this letter, Pirrone directed Steven Sacharoff to take a leave of absence, seek professional help, and undergo sensitivity training. Pirrone also requested in the letter that Steven Sacharoff not be permitted to return to the New Deal facility "until he has completed evaluation by a professional indicating that he is fully rehabilitated and assuring New Deal Delivery Service, Inc. and its partnership that such behavior is unlikely to manifest itself again in the future." *See* Certification of Jane B. Jacobs, Exh. A–16. Steven Sacharoff signed the letter.

## II. *PROCEDURAL HISTORY*

On December 15, 1995, seventeen months after her termination from New Deal, Lynch filed this lawsuit in the United States District

Court for the District of New Jersey.[2] In her Complaint, she alleges New Jersey state-law claims of hostile work environment and *quid pro quo* sexual harassment (Count One); retaliatory discharge (Count Two); gender motivated termination and denial of termination related benefits (Count Three); intentional infliction of emotional distress (Count Four); breach of the implied covenant of good faith and fair dealing in contract (Count Five); violation of the public policy of the State of New Jersey (Count Six); and breach of contract (Count Seven). Jurisdiction is based upon diversity of citizenship and an amount in controversy exceeding $50,000. *See* 28 U.S.C. § 1332 (amended Oct. 19, 1996).[3]

Lynch contends that she has lost earnings and employment benefits and has suffered and continues to suffer severe anxiety, stress, humiliation and other damage to her emotional well-being. She asserts that she is entitled to compensatory and punitive damages, costs, and attorney's fees. Defendants now move for summary judgment against Lynch on all counts.

## III. *STANDARD FOR SUMMARY JUDGMENT*

Summary judgment is appropriate when the moving party establishes that "there is no genuine issue of material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. *Celotex v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2554–55, 91 L.Ed.2d 265 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." *Matsushita Electric Industrial*

*Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *Sound Ship Building Corp. v. Bethlehem Steel Co.*, 533 F.2d 96, 99 (3d Cir.), *cert. denied*, 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976). The material fact or facts become genuine when a reasonable trier of fact could render a verdict for the non-moving party. *Healy v. New York Life Ins. Co.*, 860 F.2d 1209, 1219 n. 3 (3d Cir.1988), *cert. denied*, 490 U.S. 1098, 109 S.Ct. 2449, 104 L.Ed.2d 1004 (1989).

At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party. *Meyer v. Riegel Prod. Corp.*, 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. dismissed*, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984).

## IV. *ANALYSIS*

Lynch alleges that she was subjected to a hostile work environment and *quid pro quo* sexual harassment in violation of the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5–1 *et seq.* (West 1993 & Supp. 1997). She also claims that in terminating her employment, defendants unlawfully retaliated against her for resisting the alleged sexual harassment and hostile work environment, in violation of the New Jersey Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19–1 *et seq.* (West 1988 & Supp. 1997). She alleges that she was discharged and denied termination related benefits on account of her sex, in violation of the NJLAD. Lynch also contends that

**2.** New Jersey law does not require that a party file an administrative complaint with the New Jersey Division of Civil Rights or the Equal Employment Opportunity Commission before filing a claim under the New Jersey Law Against Discrimination ("NJLAD"). *Ditzel v. University of*

*Medicine and Dentistry of N.J.*, 962 F.Supp. 595, 601 (D.N.J.1997).

**3.** Lynch filed suit in 1995, before Congress amended 28 U.S.C. § 1332 to provide for an amount in controversy exceeding $75,000.

defendants' conduct toward her constituted a breach of contract and a breach of the implied covenant of good faith and fair dealing. Furthermore, Lynch alleges that defendants maliciously engaged in a course of extreme and outrageous conduct which caused her severe emotional distress. Finally, Lynch claims that during the time she was harassed at New Deal, defendants, in violation of the public policy of the State of New Jersey, wilfully failed to institute appropriate measures to ensure an atmosphere free of gender-based bias and/or discrimination.

A. *Whether Lynch Has Adduced Evidence Sufficient To Establish A Claim Of Hostile Work Environment.*

■ To establish a hostile work environment claim, plaintiff must show that the conduct complained of (1) would not have occurred but for the employee's gender; and it was (2) severe and pervasive enough to make a(3) reasonable woman believe that (4) the conditions of employment were altered and the working environment was hostile or abusive. *Lehmann v. Toys 'R' Us, Inc.*, 132 N.J. 587, 603–04, 626 A.2d 445 (1993). The second, third and fourth prongs of this test are to some degree inseparable and must be viewed as interdependent. *Id.*

1. *Whether the alleged harassing conduct occurred because of Lynch's gender.*

■ Under the NJLAD, the alleged harassing conduct need not be intentional in order to violate the statute. *Lehmann*, 132 N.J. at 604, 626 A.2d 445. The plaintiff need only establish that the conduct would not have occurred but for her sex. *Id.* at 604–05, 626 A.2d 445. If the harassing conduct is sexual by nature, this element is automatically satisfied. *Id.* at 605, 626 A.2d 445. When the conduct is not clearly sexual or sexist in nature, a plaintiff must establish a *prima facie* case by showing that the conduct more likely than not occurred because of her sex. *Id.* This may be achieved by showing that the harassing conduct was accompanied by other harassment that was obviously sex-based or by showing that only women suffered from the harassing conduct. *Id.* Once she has established a *prima facie* case, plaintiff invokes a rebuttable presumption that the conduct occurred because of her gender. *Id.*

■ Lynch argues that the alleged harassing conduct, particularly Geik's attentions to her, would not have occurred if she were not a woman. She submits evidence that he phoned her at night at the corporate apartment and requested a key for his use. He speculated publicly that she must be having an affair and confided in her about his deteriorating marriage. He commented appreciatively about her body and said her work-outs must be paying off. Lastly, he invited her to exercise with him at his gym and have dinner with him afterwards.

Construing the facts and inferences in the light most favorable to Lynch, the non-moving party, a factfinder could reasonably conclude that Geik's conduct contained an undertone of sexuality that would not have occurred but for Lynch being a woman. Each incident may separately, as defendants argue, have been directed at an individual of either sex. Taken in combination, however, a jury could find that Geik treated Lynch in a manner in which he would not have treated a male co-worker. Lynch has presented enough evidence to invoke the rebuttable presumption that the conduct more likely than not occurred because of her gender. Therefore, Lynch has met the first element of the *Lehmann* test.

2. *Whether the conduct was severe or pervasive enough to make a reasonable woman believe that the working environment was hostile and abusive.*

■ To defeat summary judgment, Lynch must adduce sufficient evidence from which the factfinder could conclude that the harassing conduct was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Lehmann*, 132 N.J. at 608, 626 A.2d 445 (quoting *Ellison v. Brady*, 924 F.2d 872, 876 (9th Cir.1991)). It is the harassing conduct that must be severe or pervasive, not the reaction of the harassed individual or the impact it has on the work environment. *Id.* at 606, 626 A.2d 445.

Rather than considering each incident alone, the court must consider the cumulative effect of all the incidents. *Id.* at 607, 626 A.2d 445. Factors contributing to a hostile environment include the frequency and severity of the conduct and whether it was physically threatening or humiliating. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993).[4]

A plaintiff can establish the requisite level of harm if she demonstrates that the working conditions were affected by the harassment to the point that a reasonable woman would consider the working conditions altered. *Lehmann*, 132 N.J. at 611–12, 626 A.2d 445. The *Lehmann* court stated that it is appropriate to consider not only conduct directed at the plaintiff, but to her colleagues as well, noting that

> [t]he plaintiff's work environment is affected not only by conduct directed at herself but also by the treatment of others. A woman's perception that her work environment is hostile to women will obviously be reinforced if she witnesses the harassment of other female workers.

*Id.* at 611, 626 A.2d 445.

Lynch was employed at New Deal for approximately eight months. During those eight months, the female employees of the company, with Pirrone's permission, hired a male stripper for her birthday. Lynch was clearly made uncomfortable by the stripper's performance, but it is undisputed that the female employees of the company instigated and arranged for the stripper to perform for and celebrate Lynch's birthday. The Court does not view this activity, sponsored by Lynch's female co-workers, as contributing to a hostile environment: Sexual harassment is more than the expression of taste.

Lynch also contends that she was subjected to unwanted attention by Geik. Geik invited her to work out at his gym with him and have dinner with him on several occasions.

Geik also commented appreciatively about her body, asked her for a key to the corporate apartment she used during the week, and speculated in front of other co-workers that she must be having an affair. He phoned her at the apartment at night to discuss business, but Lynch concedes that he never proposed anything improper. Lynch also admits that when she declined Geik's dinner invitations, he did not pursue the issue further or act in a hostile manner toward her.

In addition to the incidents involving Geik and herself, Lynch has presented evidence showing that several other women were harassed at New Deal. During her tenure at New Deal, Lynch was asked to discharge a female receptionist because she was "too pretty." She heard from Pirrone that Steven Sacharoff had a history of "putting his hands on" women-and witnessed examples of this behavior. She also received complaints from Lefebre about Steven Sacharoff's behavior and was asked to comfort Gancarz after he had lifted her into the air. Finally, Lynch witnessed Steven Sacharoff, Geik, and another individual making light of the report that Scott Roberts, an executive of a company affiliated with New Deal, had exposed himself to a female job applicant at his company.

It is not required that the plaintiff suffer an extreme emotional response to the alleged harassment. *See Harris*, 510 U.S. at 22, 114 S.Ct. at 370–71 ("Title VII comes into play before the harassing conduct leads to a nervous breakdown."). All that is required is that the average woman would consider her work environment sufficiently altered. *See Lehmann*, 132 N.J. at 608, 626 A.2d 445. However, none of these incidents in isolation nor collectively could lead a factfinder to reasonably conclude that any harassing conduct was so severe and pervasive as to permit a finding that the conditions of Lynch's employment were altered.

*See Dixon v. Rutgers, The State Univ. of N.J.*, 110 N.J. 432, 443, 541 A.2d 1046 (1988); *Clowes v. Terminix Int'l, Inc.*, 109 N.J. 575, 595, 538 A.2d 794 (1988); *Peper v. Princeton Univ.*, 77 N.J. 55, 82–83, 389 A.2d 465 (1978).

---

**4.** The New Jersey Supreme Court has often relied upon federal standards in interpreting the NJLAD, recognizing that the state statutes and Title VII of the Civil Rights Act of 1964 both aim to eliminate discrimination from the workplace.

With regard to Geik's attentions, no reasonable person could characterize his behavior as severe or pervasive harassment. Undoubtedly, Lynch may have found his phone calls and invitations annoying. His one comment about her body, as well as his discussions of his failing marriage, may certainly have been unwelcome. Although a person is legally entitled to a work environment free of hostility, she is not entitled to a perfect workplace, free of annoyances and colleagues she finds disagreeable. In short, what is illegal is a "hostile work environment," not an "annoying work environment."

Looking at the evidence involving other women at New Deal presents a closer question. On three occasions, Lynch was asked to handle the fallout from the harassing conduct of Steven Sacharoff, such as being instructed to fire a receptionist for being "too pretty." She also saw Steven Sacharoff "put his hands on" other female employees.

Even with the evidence of these incidents, no factfinder could conclude that a reasonable woman in Lynch's position would feel that she was subjected to, and affected by, a work environment at New Deal that was so hostile as to alter the conditions of her employment. Certainly, there is no evidence that these incidents were frequent or chronic. Nor could a reasonable factfinder characterize them as severe or pervasive. There is no evidence that Lynch was upset by the incidents at the time of any occurrence or during her employment period. Collectively, they do not rise to the level required to render a work environment hostile and bring it within the purview of the NJLAD. It follows that Lynch has failed to present sufficient evidence to withstand a motion for summary judgment against her claim of hostile work environment.

B. *Whether Lynch Can Establish A Claim Of Quid Pro Quo Sexual Harassment.*

Lynch contends that she was subjected to *quid pro quo* sexual harassment constituting actionable sex discrimination in violation of the NJLAD. *Quid pro quo* sexual harassment occurs when an employer attempts to make an employee's submission to

sexual demands a condition of her employment. *Lehmann v. Toys 'R' Us, Inc.,* 132 N.J. 587, 601, 626 A.2d 445 (1993); *see also Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1296–97 (3d Cir. 1997) (establishing similar test under Title VII). "It involves an implicit or explicit threat that if the employee does not accede to the sexual demands, he or she will lose his or her job, receive unfavorable performance reviews, be passed over for promotions, or suffer other adverse employment consequences." *Lehmann,* 132 N.J. at 601, 626 A.2d 445.

Lynch presents no evidence of sexual demands from any individual at New Deal. She states in a conclusory manner that "it is clear that officers and owners of New Deal engaged in *quid pro quo* sexual harassment" and that if Lynch had accepted Geik's advances she would still be working at New Deal. However, she testified that when she declined Geik's invitations, he did not push the issue further or pressure her to change her mind. She also admits that Geik did not appear hostile toward her as a result of these rejections. However his conduct might otherwise be interpreted, no reasonable factfinder could conclude Geik's attentions ever involved an implicit or explicit threat. Geik's invitations to dinner, without more, cannot be reasonably characterized as the type of sexual demand that would give rise to a *quid pro quo* claim.

Lynch also presents evidence that McElroy and Gancarz were given large sums of money to leave New Deal after they had complained of sexual harassment. This, however, does not strengthen Lynch's claim of *quid pro quo* sexual harassment. The Court concludes that Lynch has failed to adduce sufficient evidence to fend off defendants' motion for summary judgment on this claim.

C. *Whether Lynch Has Presented Sufficient Evidence to Establish A Claim Of Unlawful Discharge.*

The NJLAD prohibits an

employer, because of the ... sex ... of any individual ... to refuse to hire or employ or to bar or to discharge or require to retire, unless justified by lawful consid-

erations other than age, from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment[.]

N.J.S.A. 10:5–12(a) (West Supp. 1997).

The United States Supreme Court established a framework for analyzing claims of discrimination in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973) and *Texas Dept. Of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). The New Jersey Supreme Court often looks to this framework and to federal standards in interpreting the NJLAD. *See, e.g., Clowes v. Terminix Int'l. Inc.,* 109 N.J. 575, 595–97, 538 A.2d 794 (1988).

Under the *McDonnell/Burdine* framework, the plaintiff must first make out a *prima facie* case, which raises a rebuttable inference of discrimination. *Burdine,* 450 U.S. at 252–54, 101 S.Ct. at 1093–94. If the plaintiff succeeds in doing so, the burden shifts to the defendants to "articulate some legitimate, non-discriminatory reason for [plaintiff's] treatment." *Id.* at 253, 101 S.Ct. at 1093. The explanation must be one that would be legally sufficient to justify a judgment for the defendant. *Id.* at 255–56, 101 S.Ct. at 1094–95. The plaintiff must point to sufficient evidence in the record that the reasons proffered by the defendant were not truthful but rather "merely a fabricated justification for discriminatory conduct." *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 898 (3d Cir.) (*en banc*), *cert. dismissed,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). A reason "cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993) (citations omitted). At all times, the burden of persuasion remains on the plaintiff to prove her case by the preponderance of the believable evidence.

*Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94.

New Jersey has modified the *McDonnell* test in the context of discriminatory discharge claims. *Clowes,* 109 N.J. at 596–97, 538 A.2d 794. In order to establish a *prima facie* case of discriminatory discharge, the plaintiff must prove each of the following elements by a preponderance of the believable evidence:

(1) the plaintiff is a member of a protected class;

(2) the plaintiff was performing her job in a satisfactory manner, i.e., she was performing her job at a level which met her employer's legitimate expectations;

(3) the plaintiff was nevertheless discharged; and

(4) the plaintiff was replaced by a non-protected worker.

*Id.; Catalane v. Gilian Instrument Corp.,* 271 N.J.Super. 476, 496–97, 638 A.2d 1341 (App.Div.1994); *Chipollini,* 814 F.2d at 897. *See also Dixon v. Rutgers, The State Univ. of New Jersey,* 110 N.J. 432, 443, 541 A.2d 1046 (1988) (applying similar test in context of non-discharge discrimination claim).

A plaintiff will survive summary judgment if he or she can produce sufficient evidence that the employer's proffered reasons for the allegedly discriminatory action are merely a fabricated justification for that action. *See Brewer v. Quaker State Oil Refining Corp.,* 72 F.3d 326, 331 (3d Cir.1995); *Erickson v. Marsh & McLennan Co.,* 117 N.J. 539, 550, 569 A.2d 793 (1990). The plaintiff can do so by offering either direct or circumstantial evidence that (1) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action; or (2) casts sufficient doubt upon each of the legitimate reasons proffered by the defendants so that a factfinder could reasonably conclude that each reason was a *post hoc* fabrication. *Fuentes v. Perskie,* 32 F.3d 759, 762–64 (3d Cir.1994); *Chipollini,* 814 F.2d at 898.[5]

---

5. Evidence of pretext permits the trier of fact to infer the ultimate fact of intentional discrimination at trial; however, it does not compel judg-ment for the plaintiff. *Hicks,* 509 U.S. at 511, 113 S.Ct. at 2749–50.

In *Fuentes,* the Third Circuit expanded upon what a plaintiff needs to do in order to meet her burden of demonstrating pretext:

> [T]o discredit the employer's proffered reason, ... the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason that a reasonable factfinder could rationally find them "unworthy of credence" and hence infer "that the employer did not act for [the asserted] nondiscriminatory reasons."

*Id.* at 765 (citations omitted).

Defendants do not dispute that Lynch has established a *prima facie* case of gender-based termination. While they maintain that she will not be able to prove that she was performing adequately, they are willing to agree for the purposes of summary judgment that she is a member of a protected class; she was performing her job in a satisfactory manner; she was discharged; and she was replaced by a man.

Once Lynch has established a *prima facie* case of gender-based termination, the burden shifts to defendants to give a nondiscriminatory reason for Lynch's termination. Defendants claim that the termination was a business decision based upon an assessment of Lynch's usefulness to the company and its ability to afford her salary during financially difficult times. They note that they paid Lynch's male replacement $50,000 less than they had paid her.

Defendants' burden is only a burden of production. Once a non-discriminatory reason has been asserted, the burden shifts back to plaintiff to offer evidence from which a jury could determine that defendants' reasons are merely a pretext for sex-based discrimination.

As evidence of pretext, Lynch first contends that she could not have been terminated because of cost-cutting measures because the difference between her salary and the salary of her replacement was only $50,000, an inconsiderable sum compared to New Deal's overall payroll. Also, Pirrone received a $20,000 raise at the same time that Lynch was discharged. Second, Lynch asserts that the company's financial statements are inconsistent and present a triable issue of fact as to whether New Deal was in need of cost-cutting. Assuming that there was a cost-cutting need, Lynch further claims that terminating her employment was counter-productive because she had saved the company approximately $1 million dollars during her tenure. Lastly, Lynch points out that it was not until after she was fired that defendants asserted that her performance was unsatisfactory. During her employment, Lynch contends that she never received any complaints.

Defendants rely on *Billet v. CIGNA Corp.,* 940 F.2d 812 (3d Cir.1991), which teaches that

> [a] plaintiff has the burden of casting doubt on an employer's articulated reasons for an employment decision. Without some evidence to cast this doubt, [a] court [should] not interfere in an otherwise valid management decision. To require less would be to expose to litigation every management decision impacting on a protected party.

*Id.* at 828. They contend that Lynch's arguments directed to "pretext" are an impermissible attempt to second-guess New Deal's legitimate business decisions.

The proper inquiry is not whether defendants' business decisions were wise or desirable. *See McCoy v. WGN Continental Broadcasting Co.,* 957 F.2d 368, 373 (7th Cir.1992). Thus, it is not for this Court or a jury to say that discharging Lynch was counter-productive because her actions as chief financial officer were saving New Deal money. Nor would it be proper to analyze the correctness of New Deal's termination of Lynch's employment in favor of an individual who would earn $50,000 less, or defendants' decision to give Pirrone a raise. Rather, the question is whether there is sufficient evidence that the defendants did not believe

that the reasons they proffered for Lynch's termination were truthful. *See id.* ("[T]he issue of pretext ... addresses the issue of whether the employer honestly believes in the reasons it offers.").

Although this case presents a close question, the Court cannot find sufficient objective evidence of problems with the company or with Lynch's performance to make the claim of pretext implausible. *Cf. Billet,* 940 F.2d at 828 ("In this case, there was simply too much *objective* evidence of problems with Billet's performance to make his claim of pretext plausible." (emphasis in original)). Defendants contend that New Deal went out of business after Lynch was fired, but there is no independent evidence of this in the record. Defendant Steven Sacharoff admitted in his deposition that although he voiced his concerns about receivables to Lynch, he never notified her that defendants were unsatisfied with her performance and that her job was in jeopardy. Additionally, six weeks before her discharge and after Bernard Sacharoff's death, Geik told Lynch, "You know, we are relying on you, Fran, you're in charge now, Bernie would have wanted you to carry on[.] ... We are depending on you[.] ... The company is solid. Please stay with us." Lastly, while allegedly engaging in cost-cutting measures, New Deal gave Pirrone a $20,000 raise at about the same time that Lynch was terminated.

For the purposes of this motion, Lynch has presented sufficient evidence to permit the factfinder to infer that defendants' stated justification for terminating her employment—the need for cost cutting and Lynch's allegedly weak performance—was one they did not believe and was a pretext for discrimination. Summary judgment must be denied on Count Three of the Complaint.

The Court notes that Lynch has also alleged in Count Three a claim for gender-based denial of termination related benefits. Because defendants have not specifically moved for summary judgment on this claim, the Court will not address it.

6. CEPA's purpose is to protect a "whistle blower," "who, believing that the public interest overrides the interest of the organization he [or she] serves, publicly 'blows the whistle' if the organization is involved in corrupt, illegal, fraudulent,

**D.** *Whether Lynch Can Establish A Claim Of Retaliatory Discharge.*

Lynch claims in Count Two that her dismissal was an unlawful retaliation against her for resisting sexual harassment. She asserts that this retaliatory action violated New Jersey's Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19–1 *et seq.* (West 1988 & Supp.1997).[6]

CEPA contains a one year statute of limitations for bringing suit. N.J.S.A. 34:19–5; *see also Young v. Schering Corp.,* 275 N.J.Super. 221, 229, 645 A.2d 1238 (App.Div. 1994) (dismissing CEPA complaint as time-barred), *aff'd,* 141 N.J. 16, 660 A.2d 1153 (1995). Lynch was fired on July 18, 1994 and brought the instant action on December 14, 1995, seventeen months later. Thus, her CEPA claim is time-barred.

■ Plaintiff attempts to "withdraw" this count of the Complaint by way of a footnote in the argument section of her brief in opposition to summary judgment. She cannot voluntarily dismiss a claim in this manner. Accordingly, the Court grants summary judgment to defendants on the claim of retaliatory discharge.

**E.** *Whether Lynch Has Waived Her Claim Of Intentional Infliction Of Emotional Distress.*

■ Defendants argue that a common law claim for intentional infliction of emotional distress is waived by the institution of a CEPA claim. In response, Lynch tries to withdraw this count of the Complaint in her brief.

■ The relevant language of the statute reads, "[T]he institution of an action in accordance with this act shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, State law, rule or regulation or under the common law." N.J.S.A. 34:19–8

or harmful activity." *Young v. Schering Corp.,* 141 N.J. 16, 22, 660 A.2d 1153 (1995) (quoting Ralph Nader *et al., Whistleblowing: The Report of the Conference on Professional Responsibility* vii (Ralph Nader *et al.,* eds., 1972)).

(West 1988). The waiver only applies to those causes of action relating to retaliatory discharge and not to causes of action that are substantially independent of the CEPA claim. *See Young v. Schering Corp.*, 141 N.J. 16, 19, 660 A.2d 1153 (1995). A claim of intentional infliction of emotional distress in conjunction with a retaliatory discharge claim falls within the waiver provision. *See Falco v. Community Med. Ctr.*, 296 N.J.Super. 298, 318, 686 A.2d 1212 (App.Div.1997) (affirming the motion judge's determination that the emotional distress claim is waived under CEPA). Moreover, because it is the *institution* of the CEPA claim that triggers the waiver provision, Lynch's claim of intentional infliction of emotional distress would not be saved by this Court's dismissal of the underlying CEPA action for failure to comply with the statute of limitations. *See Flaherty v. The Enclave*, 255 N.J.Super. 407, 414, 605 A.2d 301 (Law Div.1992).

Lynch states that the discharge itself and the manner in which it was conducted caused her emotional distress. Because her emotional distress claim is linked to her termination, the Court finds it waived. Accordingly, defendants are entitled to summary judgment on Count Four of the Complaint.

F. *Whether Lynch Can Establish Breach of Contract or Breach of Implied Covenant of Good Faith and Fair Dealing in Contract.*

 Central to this claim is the interpretation of the letter agreement between the parties, dated November 1, 1993, which purported to govern the terms and conditions of Lynch's employment with New Deal. It is clear from the letter and from Lynch's testimony that she was an at-will employee and could be terminated at any time. The letter specifically stated, "This letter ... is not to be construed as a contract of employment, obligating either the employer, New Deal Delivery Service, Inc. or the employee, Fran J. Lynch, to a specified contract period." Defendants rely upon this statement for their argument that Lynch cannot establish

breach of contract or breach of the covenant of good faith and fair dealing because there was no valid employment agreement. However, the above-quoted statement clearly only applies to a contract for *length of employment*. The letter agreement may be binding with respect to the other terms of Lynch's compensation and employment. Among these terms are the following:

a) A base annual salary of $135,000

b) A bonus incentive plan payable at the end of 12 months of employment, or upon an earlier termination of our relationship as follows:

> Employee will utilize a "best efforts" approach to reduce both fixed and variable expenses of New Deal Delivery Service, Inc. *Employee will quantify savings to Employer in an agreed upon fashion.* The first $750,000 of savings will flow to Employer, with an incentive to be paid to Employee of 10% of all savings in excess of the initial $750,000. This incentive bonus shall be payable at the end of the twelve months of employment or upon an earlier termination of our relationship, and shall be subject to the respective employment taxes in effect at the time.

(emphasis added) The parties also agreed that the letter would "represent[ ] the complete agreement between the parties, and there are no written or oral understandings, promises or agreements that are not incorporated herein in full." The agreement was signed by Lynch and Steven Sacharoff.

 Lynch alleges that defendants breached the contract with regard to the bonus or incentives she contends that she is entitled to receive. According to her, she saved the company approximately $1,005,655 during her tenure.[7] With regard to at least $400,000 of this amount, she states that Steven Sacharoff told her, "[T]hat's one for your column," which she interpreted to refer to the incentive structure. At issue is whether defendants are bound to pay to her approximately $25,000, ten percent of the amount

---

7. The Court reaches this amount by totalling the individual amounts Lynch claims to have saved New Deal.

over $750,000 she claims to have saved New Deal.

A contract arises from offer and acceptance, and must be sufficiently definite "that the performance to be rendered by each party can be ascertained with reasonable certainty." ... Thus, if parties agree on essential terms and manifest an intention to be bound by those terms, they have created an enforceable contract.

*Schulz v. United States Boxing Ass'n,* 105 F.3d 127, 136 (1997) (quoting *Weichert Co. Realtors v. Ryan,* 128 N.J. 427, 435, 608 A.2d 280 (1992) (citations omitted).). Parties may "leave open terms in an agreement, subject to further negotiations in good faith." *Nevets C.M. Inc. v. Nissho Iwai Am. Corp.,* 726 F.Supp. 525, 532 (D.N.J.1989), *aff'd,* 899 F.2d 1218 (3d Cir.1990). In *Nevets,* the court noted that "an agreement to negotiate in good faith, 'if otherwise meeting the requisites of a contract, is an enforceable contract.'" *Id.* (quoting *Channel Home Ctrs. v. Grossman,* 795 F.2d 291, 299 (3d Cir.1986)).

Where the negotiations are in fact concluded and the contract is complete in all its essential and material terms and the parties intend it shall be obligatory, then it is enforceable, although it is deficient in the statement of those casual and incidental provisions commonly present in a formal and conventional agreement which the parties contemplate shall in due course be prepared and executed.

*Id.* (quoting *Volk v. Atlantic Acceptance & Realty Co.,* 139 N.J.Eq. 171, 173, 50 A.2d 488 (1947)). Moreover, "a contract must be construed to render performance possible, unless a construction which renders performance impossible is absolutely necessary." *Id.* at 533.

Defendants argue that the contract is invalid because it is missing a crucial term. Specifically, the parties failed to set out the proper method for quantifying savings to the company. Defendants contend that this term is material because it relates to compensation, and thus renders the letter agreement unenforceable. *See Savarese v. Pyrene Mfg. Co.,* 9 N.J. 595, 89 A.2d 237 (1952) (holding employment contract unenforceable because parties did not agree upon salary).

A contract is unenforceable for vagueness when its terms are too indefinite to allow a court to determine with reasonable certainty what each party has promised to do. *Lo Bosco v. Kure Eng'g Ltd.,* 891 F.Supp. 1020, 1025 (D.N.J.1995) (citing *Ryan,* 128 N.J. at 435, 608 A.2d 280). Although New Jersey courts focus upon the performance promised in testing an agreement for vagueness, this does not necessarily require that each term be specifically spelled out. *Id.* at 1025 (citations omitted). If the court can determine the essential terms to which the parties expressed an intent to be bound, the contract will be enforced. *Ryan,* 128 N.J. at 435, 608 A.2d 280.

Voiding a contract for vagueness is not favored. *See* E. Allen Farnsworth, *Contracts* § 3.27 at 208–09 (2d ed. 1990); *Paley v. Barton Savs. & Loan Ass'n,* 82 N.J.Super. 75, 83, 196 A.2d 682 (App.Div.), *certif. denied,* 41 N.J. 602, 198 A.2d 446 (1964). If the parties have assented to enter into an agreement, courts are not reluctant to fill in gaps or interpret ambiguous terms. *Leitner v. Braen,* 51 N.J.Super. 31, 39, 143 A.2d 256 (App.Div.1958) (holding that a promise to provide "the usual sponsorship fees" for a bowling team was sufficient); 4 Samuel Williston, *Williston on Contracts,* § 4:18 at 421–22 (4th ed. 1990).

The significant consideration here is whether or not the parties intended to enter into a binding agreement. It is manifest that such an intention was present on the part of both parties. As stated by Professor Corbin,

If the parties have concluded a transaction in which it appears that they intend to make a contract, the court should not frustrate their intention if it is possible to reach a fair and just result, even though this requires ... the filling of some gaps that the parties have left.

*Paley,* 82 N.J.Super. at 83, 196 A.2d 682 (1 Arthur L. Corbin, *Corbin on Contracts* § 95 at 400 (1963)). Only when the missing terms "go to the essence of the agreement" is a court precluded from "insert[ing] the probable or reasonable resolution of the situation which would have been provided if the par-

ties had contemplated the existing situation when the contract was formed." *Aarvig v. Aarvig*, 248 N.J.Super. 181, 186, 590 A.2d 704 (Ch.Div.1991).

■ Courts may resort to commercial practice or other usage or custom to fill in the gaps. 1 Arthur L. Corbin & Joseph M. Perrillo, *Corbin on Contracts* § 4.1 at 536 (1993). This applies even to employment agreements leaving some indefiniteness as to compensation. *Id.* (citing *Eno v. Prime Mfg. Co.*, 314 Mass. 686, 50 N.E.2d 401 (1943) (finding valid contract even where exact amount of compensation was left for later agreement after experience would indicate profits) and *Vincent v. Palmer*, 179 Md. 365, 19 A.2d 183 (1941) (granting a decree for an accounting where employee was promised a percentage of the profits of the business)). The *Lo Bosco* court noted that with regard to contracts for services in return for a percentage of some yet-to-be determined number, such as profits or sales, "the variable to which the percentage rate is applied need not be determined at the time of contracting for the contract to be enforceable." *Lo Bosco*, 891 F.Supp. at 1026.

Here, there is sufficient evidence from which one could conclude that the parties entered a valid agreement concerning the terms and conditions of Lynch's employment. Furthermore, the agreement sets out a fairly specific formula for determining the bonus—ten percent of the excess of savings over $750,000. The bonus was to be paid at the conclusion of twelve months or upon termination of Lynch's employment, whichever came first. The only term left open for future agreement was the method by which savings would be quantified. Arguably, the parties were bound to further negotiate—to arrive at an "agreed upon" quantification—in good faith. There is no evidence that the parties considered the future agreement with regard to that quantification method a barrier to the validity of the agreement.

Moreover, courts and commentators agree that where one party to the agreement has performed, the other side may not attack the validity of the contract on the grounds of indefiniteness. *See, e.g.*, Corbin & Perrillo, *supra*, at 543 ("Where one party has fully performed, the argument that the contract is too indefinite usually will not be sustained."). There is evidence in the record that Lynch fulfilled her end of the bargain—that is, she used her "best efforts" to reduce the company's expenses and costs. Significantly, defendants do not specifically deny that Lynch failed to effect any savings for the company but rather concentrate their firepower on the argument that the agreement is insufficiently definite.

Lynch has identified nothing in the record with regard to the course of the parties' conduct or any extrinsic evidence that would help the Court discern what the parties may have intended to be the proper method for computing the savings to New Deal. While this is problematic, it is not insurmountable. Lynch's right to a bonus is linked to savings she achieved as New Deal's chief financial officer, savings which may have accrued because of actions she took. Industry practice or standards, as set out by a qualified auditor, may provide a reasonable and objective measure of what effect, if any, in terms of savings, Lynch's initiatives as chief financial officer had on the company.

The Court cannot find as a matter of law that no enforceable agreement exists here. The parties have undoubtedly manifested their assent to the agreement and there is evidence that one party performed. Thus, the Court may resort to reasonable standards to fill in the "savings" hole in the agreement and effectuate the intent of the parties. Accordingly, summary judgment on Count VII of the Complaint is denied. Because defendants' argument for dismissal of plaintiff's claim of breach of an implied covenant of good faith and fair dealing rests upon their assertion that there is no valid contract between the parties (*see McQuitty v. General Dynamics Corp.*, 204 N.J.Super. 514, 499 A.2d 526 (App.Div.1985)), the Court denies summary judgment on this claim as well.

G. *Whether Lynch's Claim Of Violation of Public Policy Should Be Dismissed As A Matter Of Law.*

■ In her Complaint, Lynch asserts that defendants willfully failed to institute any manner of remediation, amelioration, or

an educational plan and failed to take appropriate measures to provide an atmosphere free of gender-based bias and/or discrimination, in violation of the public policy of the State of New Jersey. She again attempts to withdraw this claim in her brief in response to defendants' argument that Lynch cites no statute or case creating a cause of action for the violation of public policy.

The New Jersey Supreme Court has held that if the NJLAD creates a remedy for wrongful discharge based upon sex discrimination, "it might be unnecessary to recognize or create a [common-law] action to vindicate substantially the same rights and provide similar relief." *Erickson v. Marsh & McLennan Co.*, 117 N.J. 539, 562, 569 A.2d 793 (1990) (citations omitted) (reviewing plaintiff's sex-discrimination claim under the rubric of the NJLAD). Because Lynch has a viable claim under the NJLAD, the Court concludes that a sex discrimination claim based upon public policy is unnecessary. Therefore, defendants are entitled to summary judgment on the claim of violation of public policy.

## V. *CONCLUSION*

For the foregoing reasons, the Court grants in part and denies in part defendants' motion for summary judgment. An appropriate Order will follow.

### ORDER

Before the Court is the motion of defendants for summary judgment on the Complaint of plaintiff. The Court having carefully considered the arguments of counsel and the evidence of record, and for the reasons stated in the accompanying opinion,

IT IS on this 12th day of August, 1997,

ORDERED that defendants' motion for summary judgment be and hereby is *granted in part and denied in part;*

ORDERED that judgment be and hereby is entered in favor of defendants and against plaintiff on Counts One, Two, Four, and Six, and that these claims be and hereby are *dismissed* from the Complaint.