

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-16-2004

# Moses v. Corning Inc

Precedential or Non-Precedential: Non-Precedential

Docket No. 03-3003

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Moses v. Corning Inc" (2004). *2004 Decisions.* Paper 495.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/495

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

————

No. 03-3003

————

THOMAS D. MOSES,
                                    Appellant

v.

CORNING INCORPORATED

————

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil No. 01-cv-01287)
District Judge:  Hon. Gary L. Lancaster

————

Submitted Under Third Circuit LAR 34.1(a)
July 15, 2004

Before:  SLOVITER, BARRY and WEIS, Circuit Judges

(Filed:  July 16, 2004 )

————

OPINION OF THE COURT

SLOVITER, Circuit Judge.

Thomas Moses appeals from the District Court's order granting summary judgment in favor of defendant Corning Incorporated in Moses' suit alleging Corning breached its contract to provide Moses certain stock options.

## I.

A.      Employment History

Moses was the executive director and chief executive officer of Clinical Pathology Facility, Inc. ("CPF").  In November 1991, CPF was acquired by Corning and merged with an indirect subsidiary of Corning.  Also in November, Moses signed an employment agreement with CPF ("1991 Employment Agreement") pursuant to which Moses would continue his employment with CPF as president for three years, with automatic successive extensions of 18 months each unless sooner terminated in accordance with the contract. Moses was also designated as the general manager of MetPath, Inc. ("MetPath") for the region covering parts of Pennsylvania, Ohio, New York, and West Virginia.

Two years after the 1991 Employment Agreement was signed, Moses advised Dennis Jilot, then president of MetPath, that he wished to step down as president of CPF and general manager of MetPath.  Although Moses' retirement was announced in a press release on April 14, 1994, he remained an active employee under different terms and with less responsibility.

Under the terms of Moses' second employment contract with CPF effective May 1,

2

1994 ("1994 Employment Contract"), Moses received an annual salary of $200,000 and certain fringe benefits, such as insurance coverage and the use of a car. In exchange, Moses maintained some of his former responsibilities, such as coordinating the consolidation of laboratories in Youngstown and Cleveland.

As of December 31, 1996, CPF and MetPath were spun-off as subsidiaries of a new, independent company, Quest Diagnostics, Inc. ("Quest") and, as a result, CPF and MetPath ceased to be subsidiaries of Corning. But Moses continued his employment with Quest under the 1994 Employment Contract until it expired on May 25, 1997.

B.     Stock Options

On December 1, 1993, while the 1991 Employment Agreement was in effect, Corning granted Moses an option to purchase 5,000 shares of Corning common stock under Corning's 1989 Stock Option Plan. In particular, the agreement provided:

(a)     Commencing [February, 1 1996], such option may be exercised by the Optionee to the extent of fifty percent of the aggregate number of shares optioned by this Agreement; and

(b)     Commencing [February 1, 1997], such option may be exercised by the Optionee to the extent of an additional fifty percent of the aggregate number of shares optioned by this Agreement.

App. at 96.

Section 3 of the stock option agreement provides that the option shall terminate upon the happening of any of four listed events:  (1) the expiration date of the options, listed as November 30, 2003; (2) termination of Moses' employment, except in the case

of his death or retirement with the consent of Corning; (3) the expiration of three months after Moses' retirement with Corning's consent (except if he were to die during that three-month period); and (4) the expiration of twelve months after Moses' death provided that he was employed at Corning at the time of his death or he had retired with consent less than three months prior to his death. Importantly, the agreement also stipulated that if Moses worked for a subsidiary of Corning, and that subsidiary ceased to be a subsidiary of Corning during the course of Moses' employment, then the options would be terminated.

In 1994, Corning established its 1994 Employee Equity Participation Program for "executive, managerial, technical, and other employees" of Corning and its Subsidiaries. App. 145. Moses fell into this category. The program consisted of two plans: the 1994 Stock Option Plan and the 1994 Incentive Stock Plan.

On December 7, 1994, Corning granted Moses an option to purchase 2,208 additional shares pursuant to an Incentive Stock Option Agreement and 2,792 additional shares pursuant to a Non-qualified Stock Option Agreement, with both agreements subject to Corning's 1994 Employee Equity Participation Program. Under the terms of these agreements, fifty percent of the options could be purchased on or after December 7, 1996, and all the shares could be purchased on or after December 7, 1997. Under these agreements, as under the prior Stock Option Plan, the options would terminate if the subsidiary "shall cease to be a [Corning] subsidiary company and [Moses] is not

4

thereupon transferred to and employed by [Corning] or another subsidiary company."
App. at 42, 44.

On December 11, 1996, while the 1994 Employment Contract was in effect, Moses exercised his option to purchase 5,000 shares of Corning stock comprised of half of each set of options that he had received, i.e., the 1993 options, the 1994 incentive options, and the 1994 non-qualified options. After exercising these options, Moses had remaining the options to purchase 2,500 shares from the 1993 agreement, 1,396 shares from the 1994 incentive options, and 1,104 shares from the 1994 non-qualified options.

C.      Corporate Changes

Effective December 31, 1996, CPF and MetPath, Moses' employers under the 1994 Employment Agreement, ceased being subsidiaries of Corning. Under the explicit language of the agreements containing the option programs, Moses' unexpired options to purchase Corning stock would have terminated on December 31, 1996.

To alleviate this result, Corning, by two memos authored by A. John Peck and dated November 15, 1996 ("The Peck Memos"), notified the option holders that the options would not terminate but that the options would be "tied to future employment and will be forfeited if your employment with Quest Diagnostics (instead of Corning) is terminated for any reason after the [spin off]." App. at 105. The Peck Memos also explained changes in the number of options and the exercise price of those options due to changes in the number of Corning shares outstanding as a result of the spin off. Moses

5

admits that he received these memos and he signed and returned the accompanying consent form.

Moses' 1994 Employment Agreement expired on May 25, 1997. By the terms of the various stock option agreements and by the terms of the Peck Memos, the options terminated as of that date. Moses then entered into negotiations with Kurt Fischer to arrange the terms of his departure. These negotiations ran until November when an agreement was reached.

In a letter dated March 26, 1999, Moses attempted to exercise the remaining options, which, as a result of the adjustments described in the Peck Memos, were now to purchase 5,989 shares of Corning stock. He tendered the amount of $141,878.05 but was notified by Peck that his options had expired. Moses then brought this action to recover damages caused by Corning's alleged wrongful action in denying his exercise of the options.

## II.

The District Court granted summary judgment for Corning. The court, after noting that the contracts and the parties' intent were clear, explained as follows:

> Under both stock option agreements, Mr. Moses would lose his options where the company he worked for ceased to be a subsidiary of Corning. After the Quest transaction, Corning's compensation committee, deeming the loss of options of the part of many Corning employees as too harsh, amended the stock option agreements.
>
> The amendment, as described in the Peck Memos, could not be clearer. When an employee left Quest, for any reason, he or she could lose

6

their unexercised options. When Mr. Moses left Quest following the second employment agreement, he lost his unexpired options.

As there is no material dispute regarding the nature of the contracts, and that their meaning could not be plainer, summary judgment is appropriate. Mr. Moses was properly denied the ability to exercise his stock options and therefore, the court will grant Corning's motion for summary judgment.

App. at 10.

We subject a district court's grant of summary judgment to plenary review, and therefore we apply the same standard that the District Court should have applied. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 278 (3d Cir. 2000). Summary judgment is appropriate "if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Smathers v. Multi-Tool, Inc., 298 F.3d 191, 194 (3d Cir. 2002).

We agree with the District Court that the 1993 Options Agreement and the two 1994 Options Agreements were clear and unambiguous. According to Pennsylvania contract law, when interpreting a contract the court must determine the intent of the parties and give effect to all provisions of the contract. Commonwealth v. Manor Mines, Inc., 565 A.2d 428, 432 (Pa. 1989). In this case, the three options agreements contained clauses stating that the options to purchase Corning stock terminated if the Corning subsidiary that Moses worked for ceased to be a Corning subsidiary. This is the exact situation that occurred when Corning spun off CPF and MetPath, Moses' employers, to create Quest. Therefore, but for the Peck Memos, Moses' options would have been

7

terminated immediately following the spin-off. The amendment provided by the Peck Memos imposed the following condition on the extension of the options:

> Your Corning stock options will continue to be tied to future employment and will be forfeited if your employment with Quest Diagnostics (instead of Corning) is terminated <u>for any reason</u> after the Distributions.

App. at 105 (emphasis added). Moses signed and returned the consent form showing that he had understood the memos. Therefore, upon the termination of Moses' employment with Quest on May 25, 1997, all of his outstanding stock options were terminated. Because Moses' right to the stock options was created by the agreements, and the agreements themselves provided for termination upon certain events, Moses' claim that he had a vested interest in those options must fail.

However, we are not prepared to dispose of Moses' claim of equitable estoppel in similar fashion. Moses claims that when he exercised half of his options in December 1996, he was told by a representative of Corning's Legal Department that he could not exercise the remainder of his options until December 1997. As we read the agreements, this information, if given, would not have been accurate, for Moses could have exercised the options he was granted in 1993 any time following February 1997. Moses alleges that he reasonably relied upon this information in delaying the exercise of his options, and that he lost the value of his 1993 options because of that reliance.

The District Court did not discuss this claim, and we therefore do not know whether the District Court believed that the claim was not properly preserved or whether

8

the District Court rejected it <u>sub</u> <u>silentio</u> because Moses, a highly experienced executive, could not reasonably rely on information that varied from the written agreements. Under these circumstances, we will remand the matter to the District Court for its consideration in the first instance. We intimate no view on the matter.

### III.

For the reasons set forth, we will affirm the District Court's judgment insofar as it rejected Moses' contract claim and will vacate the summary judgment to the extent that it rejected Moses' putative equitable estoppel claim.