**Erica PARKER, Plaintiff,**

v.

**PHILADELPHIA NEWSPAPERS, INC., d/b/a Philadelphia Inquirer, Defendant.**

**No. CIV.A. 03–1617.**

United States District Court, E.D. Pennsylvania.

June 24, 2004.

Erica Parker, Pro se, Olugbenga O. Abiona, Philadelphia, PA, for Erica Parker, Plaintiff.

Otto W. Immel, Dechert Price & Rhoads, Philadelphia, PA, for Philadelphia Inquirer, Teamster Local 1414, Philadelphia Newspaper, Inc., d/b/a Philadelphia Inquirer, Defendants.

## MEMORANDUM

EDUARDO C. ROBRENO, District Judge.

This action is brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 *et seq.* Following plaintiff's voluntary dismissal of counts 1 and 3 of the amended complaint, the two remaining counts in this action (counts 2 and 4) allege retaliation under both the federal and state statutes. Presently before the Court is defendant's motion for summary judgment. Because genuine issues of material fact exist as to whether or not a causal link exists between plaintiff's protected activities and defendant's subsequent employment actions, the motion will be denied.

## I. BACKGROUND FACTS [1]

Philadelphia Newspapers, Inc. ("PNI" or "defendant") is the publisher of the Philadelphia Inquirer and the Philadelphia Daily News. Plaintiff is an African–American female, who worked as a part-time, "extra" mailer in PNI's mailroom facility beginning sometime in December of 1984. Mailers participate in the assembly of newspapers and perform tasks such as operating collating machines, hand stuffing items into the newspapers, and sorting newspapers. Both full-time and part-time mailers work in PNI's mailroom. "Extras" such as plaintiff work only when PNI, depending on its needs, requests additional help from the bargaining agent, the Teamsters Local No. 1414 Newspapers & Magazine Employees Union (the "Union"). The Union then, through its own procedures, selects the "extras" and as-

1. The following facts are not disputed, or if disputed, viewed in a light most favorable to the non-moving party.

signs them for employment at PNI's facilities.

On November 9, 1994, plaintiff wrote a grievance letter to Miriam Todd, PNI's mailroom manager at the time, alleging that, on the basis of her race and gender, she had been denied a full-time position in the mailroom and a full union card. On or about September 20, 1995, plaintiff filed with the National Labor Relations Board (NLRB) a charge of discrimination against both PNI and the Union. The NLRB charge contained allegations that plaintiff had been denied work assignments and membership in the Union because of her race and gender.

Four months later, on or about January 25, 1996, plaintiff filed a complaint of discrimination against both PNI and the Union with the Pennsylvania Human Relations Commission (PHRC). More specific than the NLRB charge, the PHRC complaint alleged that PNI and the Union had hired sixteen "journeypersons," several of whom were less qualified than plaintiff and had less seniority than plaintiff. Plaintiff alleged that she was denied a position because she was African–American, a female, and "in retaliation for [her] having complained about discrimination." On at least several occasions during the pendency of the PHRC complaint, plaintiff publicly protested defendant's alleged discriminatory practices by picketing and handing out fliers in front of defendant's facilities and offices.

From about March 22, 1996 to March 13, 1997, plaintiff did not work at PNI. Plaintiff claims that the reason for this hiatus was PNI's instruction to the Union not to send plaintiff to any of PNI's facilities for work as an extra.[2] Sometime in early March of 1997, an official from the NAACP, Pastor Robert Shine, intervened on behalf of plaintiff and met with defendant's corporate counsel, Robert Barron, in order to negotiate plaintiff's return to work.[3] Apparently, as a result of the meeting, PNI agreed to permit plaintiff to return to work in the mailroom.[4]

Following Pastor Shine's meeting with Barron, plaintiff was selected as an extra in PNI's mailroom facility for work on March 14, 1997. On this day, plaintiff was assigned to Table 18 in the mailroom and scheduled to work an eight hour shift which officially ended at 3:00 p.m. Her shift foreman that day was Joseph Starbin, who plaintiff had worked with during previous shifts. According to plaintiff, Starbin treated plaintiff in a "cold" manner that day that made plaintiff feel "uncomfortable."

Approximately 10–15 minutes before the conclusion of the shift, numerous mailers put on their coats and began to leave their workstations early. In defendant's version of the events, plaintiff was among this group of mailers leaving early. Despite three direct instructions from Starbin to return to her work area because she was not "knocked off," plaintiff "abandoned"

2. Defendant disputes this assertion as unsupported by competent evidence.

3. That Shine and Barron met to negotiate plaintiff's return to PNI has not been disputed by the defendant. Moreover, PNI acknowledges that plaintiff did not work between March 22, 1996 and March 13, 1997. As such, the Court will accept these two facts as circumstantial evidence that plaintiff was, as she claims, denied work by defendant in the period between March 1996 and March 1997. Additional evidence, in the form of a letter by Shine to the PHRC and the PHRC's report of its factual findings, separately corroborates plaintiff's assertion.

4. During the first week of March 1997, plaintiff continued her public protests of defendant's alleged discriminatory practices by picketing outside of PNI's offices.

her shift according to the defendant. Defendant also claims that plaintiff told Starbin to "go ahead and write her up."

Plaintiff claims, however, that she did not leave her shift early. According to plaintiff, she remained at her work area while other mailers began walking out prematurely. The group included both African–Americans and non-African-Americans, but plaintiff claims that Starbin instructed only the African–American employees to return to their work areas. Observing this, plaintiff confronted Starbin about his apparent disparate treatment and told Starbin that she was leaving the mailroom to report Starbin's discriminatory practice to the floor manager on duty at the time. As she was heading towards the manager's office, plaintiff claims that an announcement was made on the intercom signaling the end of the shift; only after this announcement was made did plaintiff leave the mailroom in her version of the story.

When plaintiff went to work the following Monday, on March 18, 1997, she noticed that her name was placed on a "do not hire" list located on a bulletin board in the mailroom office. This list comprises individuals who PNI will no longer accept for work in its mailroom. Once placed on the list, the individual subject to discipline is given the opportunity to file a grievance and request that PNI reverse its decision to place the individual on the list.

Shortly thereafter, the Union's vice-president, Bill DeFlorio, informed plaintiff that she was placed on the list because of her insubordination (i.e., leaving her shift 10–15 minutes early and disobeying a direct order from a supervisor) on March 14, 1997. After a grievance hearing in October of 1997, PNI reaffirmed its March 1997 decision thereby permanently preventing the Union from referring plaintiff for employment with the defendant.

Plaintiff filed a second complaint in the PHRC against the defendant on May 20, 1997. The second complaint, dual filed with the EEOC, alleged that plaintiff was terminated from PNI as an act of retaliation for plaintiff's filing of the first PHRC complaint, filed in January 1996. By letter dated March 26, 2003, plaintiff was informed by the PHRC that her case was closed administratively. The instant action was initiated on March 17, 2003.

## II. DISCUSSION

### A. *The Standard for Summary Judgment.*

A court may grant summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" only if its existence or non-existence would affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is "genuine" only when there is sufficient evidence from which a reasonable jury could find in favor of the non-moving party regarding the existence of that fact. *Id.* In determining whether there exist genuine issues of material fact, all inferences must be drawn, and all doubts must be resolved, in favor of the non-moving party. *Coregis Ins. Co. v. Baratta & Fenerty, Ltd.,* 264 F.3d 302, 305–06 (3d Cir.2001) (*citing Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

Although the moving party bears the burden of demonstrating the absence of a genuine issue of material fact, in a case such as this, where the non-moving party is the plaintiff, and therefore, bears the

burden of proof at trial, that party must present affirmative evidence sufficient to establish the existence of each element of his case. *Id.* at 306 (*citing Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Accordingly, a plaintiff cannot rely on unsupported assertions, speculation, or conclusory allegations to avoid the entry of summary judgment, *see Celotex,* 477 U.S. at 324, 106 S.Ct. 2548, but rather, she "must go beyond the pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Service,* 214 F.3d 402, 407 (3d Cir. 2000).

B. *An Amendment to the Complaint May Cure Plaintiff's Failure to Plead a Protected Activity She Now Relies on in Support of Her Retaliation Claim.*

Defendant argues that plaintiff's alleged statement to Starbin, complaining about his disparate treatment of African–Americans on March 14, 1997, should not be considered a protected activity in support of the retaliation claim because it was not specifically alleged in the amended complaint as part of the factual basis of plaintiff's claims. Defendant's argument, rather than going to the merits of plaintiff's claim, is grounded on a purported procedural shortcoming. The Court agrees that, while plaintiff's amended complaint does aver that she went to the manager's office to complain about Starbin, it does not specifically allege that plaintiff complained about Starbin's allegedly discriminatory conduct to his supervisors or to Starbin himself.

■ This apparent omission by plaintiff may be corrected by an amendment to the pleadings. Federal Rule of Civil Procedure 15(b) specifically deals with objections to the introduction of evidence on the

grounds that it is not within the issues raised by the pleadings. The rule provides that:

> If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits.

Fed.R.Civ.P. 15(b). Rule 15(b) further provides that the "failure so to amend does not affect the result of the trial of these issues." *Id.* There is no reason why the logic of Rule 15(b) should not apply with equal force to issues raised in the summary judgment context. Here, the amendment is technical and defendant makes no argument that the amendment would be unfairly prejudicial to its case. Thus, the Court will grant plaintiff leave to amend the complaint to include allegations that plaintiff made an informal, oral complaint to Starbin on March 14, 1997, the date of the meeting referred to in the complaint.

C. *Plaintiff's Prima Facie Case of Retaliation.*

■ To establish a prima facie case of retaliation, a plaintiff must show that: (1) the employee engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action. *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 279 (3d Cir.2000).

According to plaintiff, she engaged in three protected activities and, in response,

was greeted with three adverse employment actions. In the first, plaintiff argues that defendant refused to hire her between March of 1996 and March of 1997 in response to the PHRC charge of discrimination that she filed in January of 1996. Second, plaintiff argues that defendant refused to hire her between March 18, 1997 and October 17, 1997 in response to her January 1996 EEOC charge and her oral complaint to Starbin, her supervisor, on March 14, 1997 regarding his alleged discriminatory actions. Third, plaintiff claims that she was terminated from her employment on October 17, 1997 in response to her January 1996 and May 1997 PHRC complaints.

Because the focus of defendant's summary judgment motion is on the third element, the Court will be brief in its discussion of the first two elements and devote the majority of the analysis to the issue of causation.

### 1. *Plaintiff Engaged in Protected Activity.*

 Protected activity includes oral and written complaints and protests, whether formal or informal, to discriminatory practices prohibited by the statute. *Abramson v. William Paterson College,* 260 F.3d 265, 287–88 (3d Cir.2001). Here, plaintiff's formal PHRC and EEOC complaints, first filed in January of 1996 and later filed in May of 1997, constitute protected activity for the purposes of Title VII. *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1300 (3d Cir.1997). Plaintiff's opposition to Starbin's actions, informally voiced on March 14, 1997, also constitutes protected activity.[5] *Abramson,* 260 F.3d at 287–288; *Dilenno v. Goodwill Indus. of Mid–Eastern Pennsylvania,* 162 F.3d 235,

236 (3d Cir.1998); *Barber v. CSX Distrib. Servs.,* 68 F.3d 694, 702 (3d Cir.1995). Moreover, the Court finds that plaintiff's public protests against PNI's alleged discriminatory practices towards African–Americans, which included picketing in front of defendant's facilities during the first week of March 1997, constitutes protected activity for the purposes of Title VII. *See Payne v. McLemore's Wholesale & Retail Stores,* 654 F.2d 1130, 1137 (5th Cir.1981), *cert. denied,* 455 U.S. 1000, 102 S.Ct. 1630, 71 L.Ed.2d 866 (1982)(finding picketing in protest of discriminatory practices to be protected activity).

### 2. *Adverse Employment Action.*

 An adverse employment action is one which is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Robinson,* 120 F.3d at 1300. Defendant's alleged failure to hire plaintiff between March of 1996 and March of 1997, placement on the "do not hire" list in March of 1997, and termination in October of 1997 constitute adverse employment actions. *Id.* (discharge and refusal to rehire considered retaliatory conduct).

### 3. *Causal Connection.*

 Finally, plaintiff must establish the existence of a causal connection between her involvement in protected activity and the adverse employment action. Defendant has chosen to focus its attack on plaintiff's prima facie case on this one element. Specifically, PNI argues that the time between the filing of plaintiff's PHRC and EEOC complaints is too long from which an inference can be drawn that there is a causal connection with her placement on the "do not hire" list. PNI also

---

**5.** Because the parties dispute whether or not plaintiff complained to Starbin about his alleged singling out of African–American mail-

ers on March 14, 1997, the Court shall resolve this factual dispute in favor of the plaintiff.

argues that the there is no evidence that any decisionmaker at issue was aware of plaintiff's protected activity. Finally, PNI argues that the August 1995 administrative complaint, referred to in the amended complaint in the instant action, was against the Union and not PNI and that, therefore, there can be no causal connection between plaintiff's protected activities and defendant's employment actions.

A plaintiff alleging retaliation in a Title VII case may rely upon a "broad array" of evidence to establish causation. *Farrell*, 206 F.3d at 283. As instructed by the Third Circuit, district court's may look to the record as a whole, and may consider, among other things, evidence of temporal proximity between the alleged events, evidence of retaliatory animus or antagonism, and pretext to infer causation. *Id.* at 285–86.

a. *Temporal proximity.*

█ Temporal proximity between plaintiff's protected conduct and the employer's adverse action, when considered together with other evidence (and viewed in a light most favorable to plaintiff) may give rise to an inference of causation. *Robinson,* 120 F.3d at 1302.

In this case, the protected activity and adverse employment action which are closest in time are (1) plaintiff's informal complaint to Starbin on March 14, 1997 and her subsequent placement on the "do not hire" list, discovered by plaintiff on March 18, 1997 and (2) plaintiff's picketing activities from March 1, 1997 through March 10, 1997 and her placement on the "do not hire" list on March 18, 1997. In each of these pairings, the alleged adverse employment action occurred within days of

the protected activity. Thus, the temporal nexus is short.

Moreover, "[w]hen temporal proximity between protected activity is missing, courts may look to the intervening period for other evidence of retaliatory animus." *Krouse v. Am. Sterilizer Co.,* 126 F.3d 494, 503–04 (3d Cir.1997). As noted, evidence of antagonistic conduct or animus is probative of a causal link between protected activity and adverse employment action. *Farrell,* 206 F.3d at 281.

Here, plaintiff claims that Starbin had a "cold demeanor" towards her on the day of her return to work in the mailroom on the 14th of March. *See Farrell,* 206 F.3d at 286 (considering evidence of the demeanor of plaintiff's supervisor). Of the numerous mailers who attempted to leave the shift prematurely on March 14th, Starbin has testified that he recorded only plaintiff's departure time on a white notepad. Although Starbin has testified that he does not recall if any other mailers actually left their shifts early, plaintiff has provided the names of several other mailers whom she claims left their shifts early, but whose departure times were not recorded by Starbin and who were not subsequently written up and placed on the "do not hire" list. In fact, Starbin's note to Larry Crouch, assistant director of packaging and distribution, written on the day of the incident states that "The Group as a whole started to walk off the table and leave for the day." Additionally, Starbin testified in his deposition that he saw more than one person putting on their coat and appearing as if they were leaving, but that the only person whose name he wrote down was plaintiff's.[6] James Hickson, another mailer working in the PNI mailroom, has, by affidavit, corroborated plaintiff's conten-

---

6. In fact, Starbin has testified that, of the twenty or so mailers who appeared to be leaving early, he followed only plaintiff as she

walked towards the mailroom office and repeated his instruction that the shift was not over to plaintiff alone as he followed her.

tion that other mailers departed early and PNI concedes that no other mailers were written up for leaving early.

From Starbin's "cold demeanor" towards plaintiff and his singling out of plaintiff for discipline, a factfinder may infer that his actions were motivated by antagonism towards plaintiff and retaliatory animus. *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir.1991) ("A causal connection may be established ... through other evidence such as disparate treatment of fellow employees who engaged in similar conduct." (*quoting DeCintio v. Westchester County Med. Ctr.*, 821 F.2d 111, 115 (2d Cir.1987), *cert. denied*, 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987))). Thus, plaintiff has proffered evidence in addition to temporal proximity to substantiate her argument for causation.

### b. *Evidence of a Pattern of Antagonism.*

Moreover, the Court finds that there is evidence on the record for the finder of fact to conclude that a pattern of antagonism was directed towards plaintiff following the filing of her PHRC complaint in January of 1996. Approximately two months after the PHRC complaint was filed, defendant refused to hire plaintiff for mailroom duties. This action may be considered an act of antagonism towards plaintiff in the absence of evidence that defendant's action was a discrete response to a particular occurrence. *Cf. Weston v. Pennsylvania*, 251 F.3d 420, 432 (3d Cir.2001)(finding no pattern of antagonism because adverse employment actions were discrete responses to particular occurrences).

If plaintiff's version of the events of March 14, 1997 is adopted, an inference can be drawn that plaintiff's placement on

the "do not hire" list was a further act of antagonism. Additionally, following the events which occurred on March 14, 1997 plaintiff was not granted a disciplinary hearing to challenge her placement on the "do not hire" list until October of 1997, approximately seven months after the incident. According to plaintiff's union representative, Anthony Amendolia, disciplinary hearings for suspended workers were scheduled as soon as possible to avoid a prolonged period of back pay should the basis for the discipline not be substantiated. That plaintiff's hearing took place in October was out of the ordinary because, in Amendolia's view, it "never" took more seven months to schedule a disciplinary hearing.[7] When all inferences are drawn in favor of the plaintiff, this unusual delay may also be considered an act of antagonism toward plaintiff.

### c. *Evidence of Pretext.*

■ Evidence of pretext, necessary for plaintiff to rebut defendant's proffered reasons for its employment actions during the burden-shifting phase of the case, may also be germane to the issue of causation and, therefore, may be seized upon by plaintiff in support of her prima facie case. *Farrell*, 206 F.3d at 286 ("nothing requires us to ration evidence between one stage or the other"); *Weston*, 251 F.3d at 432 ("pretext evidence can be relevant to causation."). To establish pretext, plaintiff may point "to such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Fuentes*, 32 F.3d at 765 (internal quotations omitted). "A decision foolish, imprudent, or incompe-

---

**7.** This disparate treatment, standing on its own, would also give rise to an inference of causation. *Palma*, 931 F.2d at 207; *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir.1994).

tent by comparison to the employer's usual mode of operation can render it implausible, inconsistent, contradictory, or weak." *Id.* at n. 8.

The question to be asked in this case is whether plaintiff has either: (i) "present[ed] sufficient evidence to meaningfully throw into question, i.e., to cast substantial doubt upon, the [employer's] proffered reasons for not hiring him (e.g., by painting them as weak, implausible, contradictory, or incoherent), or (ii) to come forward with sufficient evidence from which a factfinder could reasonably conclude that an illegitimate factor more likely than not was a motivating or determinative cause of the adverse employment decision (e.g., by showing that the employer in the past had subjected him to unlawful discriminatory treatment, that the employer treated other, similarly situated persons not of his protected class more favorably, or that the employer has discriminated against other members of his protected class or other protected categories of persons)." *Id.* at 765.

The Court finds that plaintiff has provided evidence to cast doubt upon defendant's proffered reasons for its employment actions. The facts surrounding the last 10–15 minutes of plaintiff's shift on March 14, 1997 are in dispute and, as acknowledged by Starbin, essentially boil down to whose credibility is afforded the most weight by the factfinder. According to defendant, plaintiff was placed on the "do not hire" list and eventually terminated because she was insubordinate and because she left her shift early.[8] However, plaintiff has testified that she did not leave the mailroom until an announcement was made indicating her shift had ended. If the factfinder concludes that plaintiff's version bears

more credence than Starbin's, an inference may be drawn that the proffered reason for terminating plaintiff was fabricated.

To support this theory, plaintiff has proffered evidence that, based on Starbin's own notes, it would have been physically impossible for plaintiff to have left the mailroom before the end of the shift. According to Starbin, it was 2:48 p.m. when plaintiff was observed leaving her work area, located at Table 18. Due to the immense size of the mailroom—two to three blocks in length according to Starbin—plaintiff argues that it would have been impossible for her to have left the mailroom floor (alleged by defendant to be sometime before 2:55 p.m.) prior to the end of shift announcement because Table 18 and the mailroom office, the area in which Starbin alleges he last told plaintiff that she was not yet "knocked off," are on opposite ends of the mailroom floor. Should the finder of fact agree with plaintiff, a fatal weakness in the facts underlying defendant's reason for termination would be exposed.

Pretext may also be inferred from evidence that "the employer treated other, similarly situated persons not of his protected class more favorably, or that the employer has discriminated against other members of his protected class or other protected categories of persons." *Fuentes*, 32 F.3d at 765. According to Amendolia, plaintiff's union representative, PNI management "was more punitive towards African–Americans, than Caucasian, for alleged similar infractions." This observation was based on Amendolia's representation of all employees in the PNI mailroom and his attendance in all disciplinary hearings held for mailers.

---

**8.** Defendant has proffered no legitimate, nondiscriminatory reason for not hiring plaintiff between March of 1996 and March of 1997.

"A decision foolish, imprudent, or incompetent by comparison to the employer's usual mode of operation can render it implausible, inconsistent, contradictory, or weak." *Id.* at n. 8. Again, the Court notes that plaintiff has provided evidence that it was unusual for a disciplinary hearing to be scheduled seven months after a mailer was placed on the "do not hire" list. As testified by Amendolia, PNI's usual procedure was to schedule the hearings as soon as possible in order to avoid paying back pay for extended periods of time in the event that the disciplinary action was overturned at the hearing. That PNI waited so long and placed itself at risk of paying plaintiff significant amounts of back pay may be construed as evidence of imprudent decisionmaking in comparison to the PNI's usual mode of operation.[9]

### d. *Decisionmakers' Knowledge or Awareness of Plaintiff's Protected Activities.*

As noted by defendant, the absence of any evidence indicating that a decisionmaker working for the employer had knowledge of a plaintiff's protected activity may provide courts with a basis to conclude that no causal link exists. *See, e.g., Clark County School District v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001); *Jones v. School Dist. of Philadelphia,* 198 F.3d 403, 415 (3d

Cir.1999); *Merit v. Southeastern Pennsylvania Transit Authority,* 315 F.Supp.2d 689, 707 (E.D.Pa.2004). However, despite defendant's arguments to the contrary, plaintiff has provided circumstantial evidence from which a finder of fact could conclude that the decisionmakers at issue were aware of plaintiff's protected activities.

Plaintiff has proffered the deposition testimony from Donna Sheckler, human resources manager for PNI between March of 1987 and March of 1998, indicating that she investigated two external complaints of discrimination filed by plaintiff and that PNI's procedure for handling such complaints involved interviewing those alleged to be involved in the discriminatory acts. This testimony creates a genuine issue of material fact as to whether or not plaintiff's supervisors and/or PNI management personnel in the position to make employment decisions knew about plaintiff's involvement in protected activities through the course of Scheckler's investigation into plaintiff's two external complaints of discrimination.[10]

Moreover, plaintiff claims that she was involved in displays of protest, i.e., picketing, outside of defendant's facilities. The public nature of these protests may give rise to an inference that upper-level man-

---

**9.** In addition, Amendolia has stated that plaintiff's disciplinary hearing was not a hearing because "[t]he management person at the so-called hearing was not prepared to hear Ms. Parker's side of the incident." In other words, Amendolia believed that the hearing afforded to the plaintiff by defendant was a sham. This view may be reinforced by the fact that, after over six months of delay, the hearing was scheduled after the PHRC notified the parties that a factfinding conference was to be held in late October of 1997 in furtherance of the PHRC's own investigation.

There are "no limits" to the type of evidence plaintiff may use to support her theory

of causation. *Farrell,* 206 F.3d at 281. Should the factfinder decide that plaintiff's hearing was a sham, this circumstance could permissibly support plaintiff's claim of pretext. *Daniels v. Pipefitters' Ass'n Local Union No. 597,* 945 F.2d 906, 919 (7th Cir.1991)(instructing, in dicta, that a sham disciplinary hearing in which plaintiff was denied the opportunity to present his case may be evidence of pretext and retaliation in a 42 U.S.C. § 1981 claim).

**10.** Defendant has offered affidavits from plaintiff's supervisors indicating otherwise.

agement was aware (through firsthand knowledge or otherwise) of plaintiff's involvement in the protected acts. The pertinent connection to the decisionmakers at issue may be taken from Amendolia's testimony that it was upper-level management, and not plaintiff's direct supervisors, that made the employment decisions concerning the termination of mailers.

Also, assuming for the purposes of the instant motion that plaintiff made an informal complaint to Starbin on March 14, 1997 concerning his alleged disparate treatment of minority workers, Starbin himself, who reported plaintiff's alleged insubordination, knew about this activity as the complaint was voiced to him directly. As noted before, plaintiff's informal complaint to Starbin is a protected activity.

Upon review of the record as a whole, the Court finds that genuine issues of material fact exist and that defendant has not shown that it is entitled to judgment as a matter of law. Not only is there evidence of a close temporal proximity between some of plaintiff's protected activity and subsequent adverse employment actions, there is evidence of retaliatory animus and a pattern of antagonism directed towards plaintiff following her filing of the PHRA and EEOC complaints. Additionally, plaintiff has proffered evidence of disparate treatment and has highlighted potential weaknesses in the facts alleged by defendant which underlie its basis for disciplining plaintiff. Taken as a whole, the evidence creates a genuine issue of material fact as to whether the requisite causation exists in the instant case.

D. *McDonnell Douglas Corp. Burden Shifting Framework.*

As an alternative to its position that plaintiff has failed to establish a prima facie case of retaliation, defendant argues that it has articulated a legitimate, non-discriminatory reason for its employment actions and that plaintiff has failed to show that this reason was pretextual.

As instructed by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), once plaintiff has established a prima facie case of discrimination, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for the employee's termination. *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 637–38 (3d Cir.1993). If the defendant meets this burden of production, plaintiff must be given the opportunity to prove by a preponderance of the evidence that the legitimate reasons proffered by the defendant are pretextual. *Id.*

As noted previously, genuine issues of material fact exist as to whether or not plaintiff was insubordinate to Starbin, and whether plaintiff prematurely left her work area on March 14, 1997. The existence of such ambiguity precludes the Court from scrutinizing defendant's proffered reason for plaintiff's placement on the "do not hire" list and eventual termination. Moreover, the Court has found that plaintiff has proffered sufficient evidence to cast doubt on defendant's proffered explanation. Therefore, the Court will not grant summary judgment because plaintiff has established a genuine issue of material fact as to whether defendant's proffered reason for its actions were legitimate.

## III. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is denied.

### ORDER

**AND NOW**, this 24th day of **June 2004**, for the reasons set forth in the accompanying memorandum, it is hereby **ORDERED**

that defendants' motion for summary judgment (doc. no. 20) is **DENIED.**

It is **FURTHER ORDERED** that plaintiff is **GRANTED LEAVE** to **AMEND** the complaint consistent with the accompanying memorandum. An amended complaint shall be filed within **10 days** of the date of this order.

**AND IT IS SO ORDERED.**